All right, we'll call our first case of the morning, which is Josephette Henry et al. versus St Croix Alumina et al. Good morning. Good morning. Rhea R. Lawrence on behalf of the appellants, 17 appellants to be exact. I would like to request three minutes for rebuttal. That's granted. May it please the court. The idea that this case where entire neighborhoods were stained red, driveways, cars, cisterns, all red. The red came from the refinery. There are only two sources for the red dust from the refinery, the bauxite in the bauxite shed, and the red mud from the red mud piles. When you say whole neighborhoods, I couldn't get from the record the scope. Are we talking about a place where 1000 people live or a place where 20 people live? Is that in the record at all? It is. The record describes the estates of Profit, Clifton Hill, Barron Spot. And I believe the projects of Harvey. And there are several hundred, if not thousands of people that would live in that area. Well, what do we take of the fact that we have 15 plaintiffs? Some people chose not to bring suit. That's just the case. Some people chose not to. And Dr. Wilbert Williams testified that he treated 40 people from the same red dust symptoms, but those people just decided not to bring suit. But that does not diminish the fact, Your Honor, that these plaintiffs decided to bring suit for damages that are compensable under the law. Well, what do we know about the composition of whatever it was that hit people's skins, skin and that they were breathing? How do we know about what do we know about the toxicity? Well, Your Honor, that's what makes this case actually so simple, because as I stated previously, only two things could have caused the red dust, bauxite or red mud. And the refiner was required to keep material safety data sheets on those two compounds. But we don't know when it left the plant, whether the water, because there was rain at the same time, diluted it to such an extent that whatever toxic principles it had weren't present in whatever hit the people and whatever hit their skin was caused by something else. But, Your Honor, the argument of dilution is actually a fiction of the defendant's imagination, because water does not neutralize the pH of red mud. It makes it worse. Well, what do we have in these expert reports? Because that's really what it's about. It's about the expert report. That's exactly right. And also summary judgment without them. What do we have in the expert reports that says it's something other than what you should not take to the bank? Well, for example, Jim Tarr, he is the air emission specialist. He specifically looked at the hurricane data that was provided and looked at the fact that these red mud piles were completely uncovered. He looked at the WAG report that stated that dusting was a problem from red mud. He looked at the wind speed, the direction of the wind, the fact that the victims were complaining of symptoms that resulted in... But none of that says that whatever hit someone's skin was toxic. But, Your Honor, what hit their homes was red mud or bauxite. Well, that's clear and that's been resolved, correct? That property damage claim has been paid. But what hit their skins was exactly what hit their homes. Yeah, but here's what I don't understand about your point. If there's a choice with regard to what hit their skin between bauxite on the one hand and bauxite residue on the other, and there's no scientific expert testimony that it is one or the other, given the different levels of toxicity, given the different levels of damage, how can we jump to the conclusion that it has to have been bauxite residue? But, Your Honor, we understand that our experts believe that the composition was greater for red mud, but the NSDS of bauxite lists the exact same health hazards with respect to bauxite exposure. Bauxite exposure is different than bauxite residue because the processing, as I understand, increases the pH level, increases the toxicity. Yes, that's correct, Your Honor, because the bauxite residue contains the caustic soda that's used to extract, excuse me, the alumina from the bauxite. However, I'm holding the bauxite material data sheet. It's JA3200. It specifically lists exposure to bauxite alone can cause mild irritation of the respiratory tract, irritation from inhalation, and if ingested, cause mild irritation. No, Your Honor, no, no. We believe so, Your Honor. We believe that there was no small amount of bauxite that escaped if it was solely bauxite, and we dispute that it was just solely bauxite. We don't know. You say you believe there is no small amount, but we don't know exactly what amount hit people's skin, do we? Your Honor, Samantha Vieira, she was nine years old, said it was raining blood. It was covered in red. That's what makes this case so easy because you could see. But it could be, I mean, when you say it's raining blood, you can put a small drop of vegetable coloring in a pail and it will turn red. The fact that it was raining blood doesn't mean there's enough there that is toxic, does it? But the EPA and the DPNR also observed the outsides of the homes stained red, the insides of the homes stained red, driveways covered with dust, cars covered with dust, yards covered with dust. Well, the fact that they're covered with dust isn't the key, is it? Because the one testing that was done did not show high levels of toxicity or EPA. Your Honor, that that EPA sample that you're speaking of was there were 61 samples. They relied on three samples to determine that was only on bauxite. And we dispute that because we don't believe the EPA was actually testing for bauxite residue because what the refinery directed them to was the bauxite shed and the hole in the bauxite shed. And in completely ignoring the fact that there are dust piles, which they themselves, their employees admitted was subject to dusting, could be carried away with wind erosion, was completely uncovered, could also have contributed to the red dust. And in fact, I believe it was Kleppinger that noted that the sodium levels from the EPA sample were elevated, that sodium came from red dust because of the caustic soda that was added to it during the process. We started we started talking about James Tarr's opinion. And in response to our request for supplemental briefing, Mr. Tarr's opinion stated that an indeterminate amount of substance containing an unknown percentage of red mud was introduced into plaintiff's neighborhoods. How is that supposed to help a jury? Your Honor, because it's about as vague as you can be. But that the case Conenquerel held that you don't have to be able to say the exact amount. When does the exact amount become crucial in a case where it's so clear and obvious that something made these people ill? It was red. The only thing that's red came from these two chemicals found at this one refinery. And both chemicals in whatever quantity, based on the MSCS sheets, can cause the symptoms that the appellants complain of. From the standpoint of a jury, if the testimony is that an unknown substance came into the neighborhood containing an unknown concentration of some toxic substance, you may nevertheless find that there was a toxic, I guess, toxicity entered the homes and caused the plaintiff's injuries. Well, Your Honor, I believe he did also opine that he believes it was red mud. There's a stronger concentration of red mud. And for sure, Klippinger, another expert that we had, specified that he believed the concentration was stronger in red mud. I see that my time is up. Can I finish? You just sum up now your time. You still until the red light. And Brotbar believes the producing cause was also red mud. Time went by so fast, I didn't want to ask you about the treating physician who was, well, he wasn't really a treating physician. He saw the plaintiffs about four years after the incident is in question. Why was it wrong for the district judge to exclude his testimony? Because Brotbar is a specialist in chemical exposure. And he used the very same methodology that every doctor facing the same situation would. You have people who self-report about what they were exposed to. But a lot of the symptoms that they had didn't match what he was opining about. I don't believe that's the case, Your Honor. I believe the record reflects that, in fact, he was opining on the red mud or bauxite. I believe he said both. The exposure to that causes skin rashes in some, respiratory problems in others, conjunctivitis in others. And this whole idea that pink eye and coxivirus 24, he ruled that out. And even the CDC went back and said there was a strong link between the people who were exposed to red dust and who lived within 1.5 miles of the refinery and the fact that they developed conjunctivitis because exposure to that pH would wear down the membrane of the eye, making them more susceptible to any viral infections. But he ruled that out. He did exactly what any doctor would do. He looked at the data, the fact that these red mud piles were uncovered, the fact that the report that the companies withheld so that the pH levels was over 12. He listened to that. He took an evaluation. He developed a differential diagnosis. May I ask you, there was a point that I was interested in. Can you explain why the material that was actually in the plaintiff's home was not tested? At the time, Your Honor, samples were not collected from the plaintiffs. I think we have to, I guess because I'm from the islands, I went through several hurricanes. I know the stress and the chaos that happens. And sometimes the plaintiffs aren't, their minds may not have been there in terms of holding, collecting samples and keeping collecting samples because these people were bathing in red water. I'm told from the record that when that substance hits, it tends to remain inside a home. It doesn't just disappear right away. That was one of the tests that was done by Dr. Bach, I think. Yes, that's exactly right. Yes, Your Honor. They were never tested. And I think there was such a no duh aspect of this case that maybe the testing was just not done because it was so obvious, especially to the experts, where it came from. The MSDS data sheets were very specific. If that had been done, it might have yielded a toxicity level that would have been a little bit, that would have been more supportive of what the experts were saying. Yes, Your Honor. But the inquiry then becomes whether that was necessary. And Dog Bear does not require the most ideal grounds. Dog Bear requires good grounds. And we believe our experts, in fact, gave good grounds. Sorry, my time is up. Thank you. We'll hear from you on rebuttal. Thank you very much. I have one question. All right, Counselor. Yes, that's right. I have one question. Yes, Your Honor. What's the support in our circuit law for the notion that we should delve through the experts' reports and use this sledgehammer, scalpel dichotomy that you've propounded? Your Honor, we believe Dog Bear and Paoli, too, support the fact that you don't just exclude an entire expert opinion. If something troubles you, take, for instance, the TAR ear dispersion modeling and the 160,000, that troubled the judge. Fine, get rid of it. He had other opinions. He looked at the wind speed, the data and all these other aspects. He examined the record and said, you know what, my conclusions are still the same, irrespective of this ear dispersion model, which I think he did a very good job on. But I mean, the judge didn't like it. But even if he cut that out, if the expert has several opinions and they come from different places and are reliable, why kick him out entirely? Just get rid of what you find to be unreliable and allow him to testify because it will help the jury. Thank you so much. Thank you. Thank you. May it please the court, Your Honor. We had asked for. Will you state your name for the record, please? I will. Renee Tatro. And we'd asked. Division of time, 12 minutes and three minutes. Yes, Your Honor. Thank you. Um, Your Honor, I'm going to start with a, uh, some words from Judge Fuente in a recent case, which I think really set the table for this case. And, and so we always like it when you quote us, I'm also going to quote an opinion that Judge Greenaway participated in. And if I have time, I also have a quote from, from one of your cases because they are right on point. But, uh, Judge Fuente recently wrote the following in the, uh, buzzard flagship case at page 800. Uh, but while the doctors could diagnose encephalopathy, it is undisputed that the condition has any number of potential causes, including viral infections, sleep apnea, and exposure to other toxins, scientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities are minimal facts necessary to sustain the plaintiff's burden in a toxic report case. And that's what we have here. Judge Greenaway. Isn't this, uh, I mean, there's red, it's raining blood. Isn't that kind of obvious? Two plus two is four. In fact, I'm wondering whether, you know, after throwing out the expert opinions, whether a jury couldn't find from a common sense standpoint that, um, something was going on here and that people, you know, were, were hurt, were injured by it. Um, what other, what other causes could there be? Your Honor, there's actually a large number of causes that are in the gazillion report that are not just the Coxsackie virus epidemic, although that was an epidemic and it did hit the Island before the hurricane. And it continued for weeks afterward. And the first time that I asked, uh, uh, Dr. Bratbar about it, well, he didn't know anything about the epidemic. So of course he didn't rule that out, but he told me all the things that Coxsackie virus can cause, including every single one of the symptoms that these people self-reported to him later. And we know how prevalent those other causes were. Well, Your Honor, the question that, uh, uh, Dr. Gazillion identifies, and it's from the scientific literature of the different things that happen after a hurricane that people are affected by. And that was in the scientific literature. So it was an alternative cause that was identified from the scientific literature that Dr. Bratbar did not rule out because he simply didn't know about them. And, um, I, I do want to come back to, to the question you asked about, could you do it on common sense and raining red? And it really goes back to the question that you were asking the opposing counsel about bauxite versus bauxite residue. The notion that bauxite caused, this is not something that brought bar testified to, it's not something that anybody testified to, and that's because bauxite is basically sand. It is red in color and it is sand. And certainly sand, if you put sand in your eyes can cause an irritation, but that's not what all the experts really were talking about. The red mud, not about bauxite. That's what, well, that's what, uh, what brought bar ultimately relates the injuries to, there's no question that bauxite residue was stored on the defendant's premises and that some of it was picked up by the hurricane and swirled around by it's the force of its winds that there is no question that bauxite residue was stored on the premises. There's no question about that. Now, one of the questions that you ask about the size of these areas, I'm sorry that I keep hitting the microphone there. Um, JA 10744 and JA 10745 are actually depictions and your honors, what's in the record or black and white, but what was in the record in front of judge Bartle were color and I have color. The color version today, judge Greenway can't say that. Are we talking about some place where a thousand people live or your honor, it was several thousand people. But what I was interested in was the geographic area. And if you look at 10744, it depicts the geographic area and then the site is, is down here. And I apologize that this is not larger, but the geographic area that is covered by the alleged impact of the red material that landed is approximately two square miles from the site up around these areas. Now, you talk about the common sense of this, and if you take the opinion that they've provided, which is rough back of the envelope, it's 160,000 pounds. You don't need scientific evidence to do the following math. I have a two square mile area. Okay. I have 5,280 feet by 5,280 feet. I have two of those units. Each one of those units has 27,878,000 square feet in it. So I multiply that too. I come up with 55,756,800 square feet. Now I spread 160,000 pounds over them. We all have all this in the record. Well, the, the, yes, these are in the record, all these numbers you're giving us. Well, I think that we can all agree that the number of feet in a mile is 5,280. And so I was just multiplying to get to a square mile of two square miles is 55. Are you, is your argument the improbability of the bauxite residue contaminating the plaintiff's homes? Well, what, what my argument, this little discussion is just going to be, if I the whole 160,000 pounds got there, how much ends up on each square foot? And it's simple math. The simple math is it is between two and three one thousandths of a pound. Would it, wouldn't this be like factual issues that, that a jury normally grapples with? I mean, does it really affect the admissibility of the reports just because it's not probable? No, Your Honor. I'm not, I'm not arguing that. I was trying to respond to the question that was asked without, without the, how much got there and, and do, do we know what got there? And you could put a little bit of red in a bucket of water and turn it red. And all I'm saying is that if you do the math, taking their numbers, what got there was about the size of a tic-tac per, per square foot, if it just came and landed and didn't blow out using their own numbers. That's all I was trying to respond to. So what's, well, what's wrong with the expert opinions? I mean, the, we require good grounds. We don't require certainty or absolutes in terms of opinions. You know, what's, what's, what's lacking in terms of what we require? Well, I think that what's lacking was summed up in the Three Mile Island opinion that Judge Greenaway participated in. We talked about the importance of dose reconstruction. Talked about the, you need to know what was released, where it was released, where it went, and then add the following. If dose reconstruction studies are credible, they must rely on solid science, state-of-the-art methods, and careful peer review. Ultimately, a dose reconstruction study will be judged by the scientific community on the basis of the technical quality of the study and its contribution to science. And these experts, as you mentioned earlier, had a back-of-the-envelope statement, had a rough approximation. That's not scientific knowledge and that's not helpful. They had qualitative, well, it was substantial. That's not helpful to a jury. It's leaving then everything to the jury to try and do the work that they didn't do. They had the opportunity. And the opposing counsel, I think, was one that I was thinking about because in a perfect world, what you would have is this hurricane dispersing the substance in the air and then four or five expert witnesses show up and start making tests. But that, it's not the real world. They're usually engaged years later and they're relying on reports of agencies, environmental groups, and so forth. And that's apparently what they did here. Well, what's wrong with that method? Your Honor, they did not, well, they threw out the agency. The plaintiff's experts threw out, and I've got, I'm going to comment on their methodology, which kind of had eight points. And the first point was, you got to throw away what two agencies did with samples collected contemporaneously, throw that out. That's not good methodology. Now, you asked the opposing counsel about samples and she said, and she's just 100% wrong about this, the plaintiff's collected samples contemporaneously with the agency, they didn't produce sample results. They threw those samples away. Ultimately, the closest it came, we're told that one of their experts, Bach, testified, and this is in the record, that he was given parts of the sample. We never saw sampling results. Did the Department of Planning and Natural Resources test the substance on the, on the, in the neighborhoods and conclude that there was contamination there? They concluded that there was bauxite there, Your Honor. That was what they did. Both agencies looked at it and they, they actually did the, both of them did contemporaneous examination. Weren't the injuries of the plaintiff as claimed consistent with bauxite contamination? Not really. That's, and that's really not what the attribution has been to bauxite because the, what, what, what Broadbar talks about is the pH level being what, what the issue was. He started out talking about chrome six and crystalline silica, but he abandoned that when we, we showed that there, in fact, was not enough of either of those to do any, any significant injuries to any of the, the plaintiffs. So he abandoned that and focused on the pH. That was really what, that's really what the case was litigated about. But the case, the, the, the, the problem here isn't bauxite, right? It's bauxite residue, correct? That, that is right. The, the problem, the alleged cause of the injuries is the bauxite residue. Red money. Right. Not, not the, not the bauxite. Your honors, I have a question about PDS. Does, does PDS require us to send the case back so that a Daubert hearing should be held? The answer to that is no. And the reason that it is no is because there are, there was a huge record in front of judge Bartle. No hearing was requested. And the post-PDS cases have made it very clear that it is within the sound discretion of the judge. If the judge has an adequate record before him to go ahead and make the ruling without a hearing. So a hearing is not mandatory. And in this situation where there were literally thousands of pages of deposition testimony, hundreds of pages of reports in front of judge Bartle, he had more than an adequate record. And he would have been within his obviously discretion to have asked for a hearing, but he did not. And neither did the plaintiffs. Your honors, I have gone over my time. I have much more to say, but I don't want to stop Mr. You don't have to stop until the red light comes on. If you want, if you have anything else you want to say, or you want to sum up the, uh, the orange light means, you know, you're, you're almost done. Well, what, what I heard from the plaintiff's lawyer was exactly what we've said when she described what Dr. Brotbar did, he argues in a circle. I don't know what got there. I don't know what concentration it took to cause a problem. I don't know how much got to the plaintiffs, but I look at the plaintiffs and I conclude that that was the cause that is a perfect circle. And that's exactly what the, we heard from the plaintiff's lawyer this morning as to what Dr. Brotbar did, he just goes in a circle. That is not a causal analysis. And now, now your time. Now, now my time is up. Thank you very much. And we'll hear from Mr. Simpson. Thank you. Good morning. And may it please the court, Andrew Simpson. Um, I'd like to briefly touch on the emotional distress arguments to make a couple of points that I don't think we're perfectly clear from our briefing. Uh, the first one is that there is a waiver of the argument that the plaintiff is entitled to prove emotional distress that's not coupled with medical causation. You're talking about if it's coupled with the property, property damage, they settled that out. Well, there's two things. They argue that we're entitled to prove, uh, medical or emotional distress separate and apart. The judge should not have granted summary judgment because we can get emotional distress without, uh, physical harm. Not hooking it up either to physical or property. Right. And, and, and they, when they, when they, when, when they argued about property damage, they said, judge, you can carve that out because you don't need medical causation for that. They didn't do that with emotional distress. They were relying on, we have physical harm and therefore we have emotional distress. It's only on appeal that they now argue that, uh, judge Bartle, sua sponte granted summary judgment on the emotional distress that's uncoupled from harm. So that was the first point that I wanted to make. Uh, the, uh, the other one on the property damage, uh, that, that the argument that, uh, we can get emotional distress attached to, to, uh, property damage, yes, the property damage claim is settled and released. And that's, that's pretty clear from the language of the agreement, is it not? I think it's very clear. And the restatement section, uh, second 929.1c says that we allow discomfort or annoyance for non-total loss only. If you have a total loss of property, you don't get it. And that's because this emotional distress is really discomfort, anguish component of property damage is tied to loss of use. So even if you have property damage and it's completely destroyed, you don't get, uh, the quote, emotional distress. Did you get emotional distress as a link to a personal injury? Yes. And, but they need, they need, they need the medical causation for that, Your Honor, and that, and they didn't have the medical causation. Oh, I do have time. Okay. And then, um, I would like to point out that restatement second 821d, which deals with the private nuisance, uh, comment B says that annoyance and emotional distress. And so that, again, this supports the argument that this distress and anguish associated with property damage is not emotional distress as we associate it and what got settled with the property damage was that component. I have you listed as addressing punitive damages. How did that get into this case? I think Judge Bartle was quite correct to, uh, the grant summary judgment on that point, the, if the plain admissions here that, you know, they knew this wasn't covered and they knew this could happen in a hurricane. I mean, there's a lot more here than you find in a normal case with respect to the knowledge on the, on the part of the defendants. Well, I think, I think if you go back in history and the record is replete, that there was no red mud issue, red dust issue in hurricane Hugo, which was a catastrophic hurricane that struck the Island. Uh, there's some deposition testimony from some of the plaintiffs that, oh, we had some dust in Maryland, which was 1995. You got me a little confused. This is a different hurricane. This is hurricane, this is hurricane George in 1998. The argument is it didn't happen in Hugo. Therefore, it's likely it didn't happen in George. No, my, my, my point is that it's the knowledge. And did we really expect that something like this was going to happen? It had never happened before, despite, uh, the, you know, history of St. Croix getting pummeled by hurricanes. So thank you very much. Thank you. We'll hear from Ms. Lawrence on a rebuttal reserved three minutes. Where do I begin? Um, let's start with Padillas and Judge Greenaway's question. We believe that because Padillas was first in time, it was rendered in 1999 based on the third circuit's internal operating procedure, rule 9.9.0. 9.1 specifically, the prior panel should govern. And Padillas is very instructive here where it states, even if a plaintiff doesn't request one, when a record such as this is so large and, and possibly complex, a Darby hearing should have been held. So we do believe that Padillas, even though subsequent decisions, um, do, do away with that particular rule, um, Padillas does govern based on the third circuit's internal operating procedures. I thought that Padillas said the exact opposite. I thought the point of Padillas was when there wasn't a sufficient record, when there was some question about exactly what the experts were saying, that it's prudent for the district court to have a Dalbert hearing here. I mean, we, we've got 9 million experts. We, we've got, uh, you know, four feet of, uh, of record. I mean, it's, uh, the question would be what would get out of Dalbert hearing that the court didn't already have? Well, Your Honor, if you look at the record, you'd see that the plaintiff's experts were subject to three, sometimes four days of depositions. Now I can tell you, I think criminal defendants have made false confessions under less stressful circumstances. But we're not, but we're not looking at any slip up or thing that they said in their deposition that, uh, not necessarily the court. Well, the court hammered in on Tarr's dispersion model and the one $60,000 figure, one 60,000 pound figure that he made, which in his mind was conservative. He was being conservative with his estimate because he wasn't, he wasn't able to further project how much left while the rain and everything, um, um, hit, so he was being conservative and it blew up into, oh, he didn't know. And he could have resolved that issue in a Dalbert hearing. Did you ever request a Dalbert hearing? No, we did. We did not. But we believe that Padilla states that even if, if, even if a plaintiff doesn't request one, one should be granted. Now the EPA sample. What do you think you could have done in a hearing that wasn't already squarely before the district court? Well, specifically with the ATA experiment and having the court understand exactly how the ATA experiment was relevant in terms of, of, of illustrating the extended exposure versus what quantity of red mud actually, um, um, hit, uh, there were, there were things that it was clear that the district court hang, hang his hat on that could have been easily resolved in a Dalbert hearing. Now, specifically with regards to the EPA sample, our experts considered the EPA sample and they also realized that what the EPA got was from the, the companies. I see my time is up. Can I just, could you respond to that? One other point, um, made by your adversary that the point that the plaintiff's in the case actually had, had substances or samples that could have been tested. There is, there is some, some discussion in the record about samples that I don't believe was preserved. There was one sample that was taken in July 17, 2003, that Bach was able to test. It was in the attic of one of the, one of the, excuse me, of, of a person. And, um, what he was able to detect red mud, um, composition in that sample. But I believe there were some samples that were collected, but weren't preserved sufficient enough for testing. Any subsequent testing is very hypothetical. I don't believe the July 17, 2003 sampling was hypothetical at all because the, it was in the attic. It was undisturbed. It did show that there were some elements of sodium and, and I forgot exactly what the composition, but Bach, Bach, um, Kleppinger, or Pine, that it was, its indicators were of red mud as opposed to bauxite. And my time is up. I wish I could talk to you more, but we do request that, that, um, for all the reasons stated in our brief, that this case be remanded. Thank you very much. Thank you, counsel. The case is well argued. We'll take it under advisement. Judge Greenaway.